## Case No. 4,051.

### In re DOYLE.

[3 N. B. R. 640 (Quarto, 158).] [1]

District Court, D. Rhode Island. 1870. [2]

BANKRUPTCY—DISCHARGE — FRAUDULENT PREFERENCES.

1. Where a discharge is refused bankrupt on the ground of his having given a preference, *held*, the bankrupt is a trustee for his creditors. Property must be administered in accordance with the provisions of the national bankrupt law [14 Stat. 517].

2. Q.—Can one of the leading purposes of the bankrupt act be thwarted by and through the means of a continuing indemnity mortgage, unlimited in amount?

[In the matter of Louis J. Doyle, a bankrupt.]

The court adjudged six of the specifications not sustained, but finding one of the four allegations embraced in a seventh specification to be established, refused a discharge. This specification contained allegations or charges of fraudulent preferences made by the petitioner—1st, to Hunt, Tillinghast & Co.; 2d, to Gideon L. Spencer; 3d, to Doyle & Joslin; and 4th, to William Barstow. The first of these was summarily disposed of, as unsupported by the proof; but in regard to the other three, the court, after recapitulating the facts and circumstances in proof, which bore upon them especially, proceeded to express its views. The charge of a preference to Spencer was dismissed as unsupported; but that of a preference to Doyle & Joslin (a payment of two thousand dollars on the 10th of December, 1868, two days prior to the petitioner's failure) was adjudged sustained, rendering it unnecessary to express an opinion upon the fourth charge of a preference to William Barstow, on or about October 1st, 1868.

The law of the case (as counsel had been apprised prior to the hearing), the court premised, was to be found in a ruling of Judge Fox, of Maine, in Re Gay [Case No. 5,279], adopted and commended by Judge Blatchford, of New York, in Re Louis [Id. 8,527]. Says Judge Fox, "I hold that in order to deprive a party of his discharge, the transfer or conveyance constituting the preference must be made by him in contemplation of bankruptcy or insolvency, or when he is in fact insolvent; and in the latter case, the court must not only be satisfied that he was insolvent, but further, that he had actual knowledge of his insolvency, or had good grounds for fearing and believing that he was insolvent, and acted on such belief in making the preference. In short, he must have designedly and intentionally given a preference, meaning to secure or pay that particular creditor, when he was not able to pay all his debts in the usual and ordinary course of business at the time, fearing and believing such to be the condition of his affairs. If such is his situation, and he so acts, meaning to secure a favored creditor, whether his other creditors shall get their pay or not, I am of opinion that he is not entitled to his discharge. He has a fraudulent purpose and design to violate the law by giving one of his creditors security, when he believes he cannot do the same by all others, or discharge his liabilities to them as they accrue."

Treating of the preference to Doyle & Joslin, the court said: Was the petitioner insolvent December 10th, 1868? Did he know, or have reasonable cause to know, that he was insolvent? Did he mean to secure or pay Doyle & Joslin, being not able to pay all his debts in the usual and ordinary course of business at the time, fearing and believing that to be the condition of his affairs? To each of these three interrogatories, I am constrained by the law and the evidence to give an affirmative answer. That the petitioner had been "insolvent," in every sense of that word, for many months, cannot be questioned. That he knew it is a fair inference from his answers to the questions put to him as to this point. When asked as to his knowledge of his condition, at various dates from March, 1867, to December 12, 1868, declining to say he did believe himself able to pay his debts, he invariably replies evasively that he could not say as to this, until his property (real estate, beaver cloths, and cassimeres, included) should be sold. But whether he knew and believed that he was insolvent, is not the question. It suffices that he had *reasonable cause* to know and believe that his condition was that of insolvency; and as to this the testimony is plenary and convincing. His books showed his insolvency, and besides this the petitioner says, truthfully I doubt not, that he always knew the state of his affairs, irrespective of his counting-house records. Throughout the summer and autumn of 1868—to name no earlier date—it is manifest that his was the condition of the "strong man struggling in a bog," keeping his head above water, to use his own expressive phrase, only through the forbearance and favor of Hunt, Tillinghast & Co., William Barstow, and, I will add, Doyle & Joslin; his business (in his own language again) going down hill with a daily increasing momentum and velocity; his property, parcel after parcel, being mortgaged, directly or indirectly, to Barstow, and his commercial paper being met only by renewals, in whole or in part, Hunt, Tillinghast & Co., and Barstow accepting and indorsing—the paper

[1] [Reprinted by permission.]
[2] [Affirmed in Case No. 4,050.]

on which they were liable being invariably cared for and protected—while the claims of other creditors, in November, if not earlier, were put off—not met in the usual course of business. Whether the Barstow and Hunt & Tillinghast paper can be said to have been met in the usual course of business (having been paid only by renewals or new loans), is a question upon which I need not here express an opinion.

As to the intent of the petitioner in paying to Doyle & Joslin the two thousand dollars, there is, it is true, some ground for difference of opinion. It is said that the plaintiff did not contemplate stopping payment and business—but until about noon of the 12th of December, 1868, confidently expected to go on, as he had been going on, hoping for better times; and therefore, it is argued, he could not have intended to prefer Doyle & Joslin. It is enough to say, in reply to this, that the evidence fails to satisfy me that the probability of a failure and a breaking up of the business within a brief period, had not been the subject of thought and meditation for days, if not weeks and months, before the 10th of December, on the part of the petitioner, with or without the privity of Barstow. Indeed, the petitioner says that Mr. Barstow had consented, in order that he might go on with his business, to indorse new paper to the amount of twelve thousand dollars, if Hunt, Tillinghast & Co. would discount that piece of paper. Nay, more, that he took with him to New York on the 12th, a note thus indorsed, which Hunt, Tillinghast & Co. declined to discount, without giving any reason, except that they did not feel inclined to do it; whereupon the petitioner then and there at once, without conference with or notice to Barstow, determined to allow his paper, due that day, to go to protest, although he had the means to meet it, and virtually then and there failed, in effect acknowledging himself bankrupt as well as insolvent. Evidently, between Doyle and Barstow, there must have passed conversation, in which the probability of a breaking up of the petitioner's business must have been alluded to, if not fully considered and discussed. Indeed, in view of the evidence and the lack of evidence, bearing upon this point, there is some reason for suspecting that this mode of bringing the Doyle business to a close, seemingly without premeditation on his part, was pre-arranged by and between two at least (if not all three) of the parties concerned. What would be the testimony of Hunt and Tillinghast and Barstow in this regard, we are left to surmise, as no questions bearing upon this point were addressed to them. The payment to Doyle & Joslin did in fact operate as a preference, for it does not appear that the petitioner made any payment to any other creditor after the 10th of December; and in view of the circumstances in proof, and of the law applicable

to them, I cannot but adjudge the payment under consideration to have been fraudulent, within the provisions of the bankrupt act.

It is but justice to the party most interested here to say that it is only when tested by the provisions of the bankrupt act, that the payment in question, or indeed any act of his brought to the notice of the court, is to be stigmatized as fraudulent, by a Rhode Island jurist, or by any of our Rhode Island moralists. He has, it appears in proof, for a long time prosecuted the hazardous business of cotton and wool manufacturing, under and in conformity with Rhode Island laws and customs, as hundreds have done before him—the few, very few, securing in the end, great wealth, and elevated social or political position—the many, without success. Under our state laws, it has always been legal, and (for aught that our ethical instructors in the pulpit or the professor's chair have taught us) honest also, to obtain possession on credit of large portions of this world's goods, to use them and peril them in the prosecution of an uncertain business; for year after year, though hopelessly insolvent, to keep creditors at bay by threats of assigning with preferences—and finally, after experimenting at the risk and expense of others for months or years, and perchance wasting in ostentatious or riotous living tens or hundreds of thousands of dollars, to make an assignment, preferring first the indorsers, upon whose credit the debtor had, in fact, lived, and moved, and had his being. To provide a remedy for, and a preventive of the multiform evils inseparable from a system like this, was, really, one of the most important of the aims of the leading legislators of 1855, 6, and 7, in framing the bankrupt act. And not hastily and inconsiderately, but deliberately, was that act adopted. Whether a wise enactment, or other than wise, it is the law of the land. Of its probable enactment the public had years of notice, and if individuals or communities failed to set their houses in order, they are entitled to little sympathy if now, in 1870, these prove untenantable. It is shown by the dates of the mortgages above referred to that the petitioner and Hunt, Tillinghast & Co., and Barstow were not oblivious of the bankrupt act in the spring of 1867, but whether the petitioner and Mr. Barstow, in the summer and autumn of 1868, were as well advised as to its provisions as they should have been, may well be questioned. That act, it is to be kept in mind, adopts as its cardinal principle the very opposite of the Rhode Island theory of property, as embodied in her laws, her judicial decisions, and the business habits of her citizens. The principle is well stated in an opinion—Perry v. Langley [Case No. 11,006] —in these words: "The intention of the law clearly was, that when a failing debtor was conscious of his inability to prosecute his business and pay his debts, he should at once subject his property to such a disposi-

tion as the bankrupt law has provided for. The property then becomes a sacred trust for the benefit of his creditors, who have a right to insist that it shall be administered, not according to the wish or preference of the insolvent, or in accordance with the insolvent law of the state, but according to the provisions of the national bankrupt law." Thus stood the law in March, 1867, and thus has it stood from that time forward, entitled to obedience on the part of the petitioner as on the part of all other good citizens. He is to be presumed to have known, after March, 1867, that an individual actually insolvent could not legally retain his possessions, real or personal, and go on for months, not to say years, consuming and jeoparding the property of his creditors, in the hope either of acquiring wealth for himself, or of obtaining the means of discharging existing obligations. The bankrupt law constitutes such a debtor a trustee for his creditors. The property in his hands is theirs, not his; and as they shall prescribe, either through commissioners or by an assignee of their appointment, that property should be administered for the benefit of its owners. Nor has this law any clause of exceptions in favor of any class of minds or any class of traders. The capable and the incapable, the sanguine and the distrustful, the reckless and the discreet. the industrious and the lazy, are all subject to the same rule. None can claim exemption. Nature or circumstances may have made the individual a Micawber, always hoping and expecting something will turn up for his advantage, or he may be preeminent among the crowd of mortals who instinctively and habitually "listen with credulity to the whispers of Fancy, and pursue with eagerness the phantoms of Hope;" still must he yield obedience to the bankrupt law, or suffer the consequences. One of these consequences is, that when he shall ask to be discharged from his debts under the beneficent provisions of the law, that discharge shall be refused, if creditors opposing shall show that he has made any fraudulent preference. This the creditors have done in this case, and therefore a discharge of the petitioner is denied.

As to the allegation of a fraudulent preference to William Barstow, I refrain from remark in this connection. My finding, as already announced, renders unnecessary here any expression of opinion upon the several very interesting questions which the court must decide in passing upon that allegation. Those questions, I will add, may be expected again to present themselves in this case on appeal, or in some other case in this district, when, it is reasonable to hope, they will be settled by an authoritative decision. One of those questions. it will be remembered, was, in effect, can one of the leading purposes of the bankrupt act be thwarted by and through the means of a continuing indemnity mortgage, unlimited in amount? a question manifestly of no ordinary interest to many a capitalist of Rhode Island, and to their legal advisers as well.

[NOTE. On the petition of the bankrupt a review of this decision was had in the circuit court, and the decree was there affirmed. See Case No. 4,050.]